# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA

v.

Criminal Action No. 04-446-51 (TFH)

JUAN JOSE MARTINEZ VEGA,
Also known as "Chiguiro,"

Defendant.

## <u>MEMORANDUM OPINION</u>

Pending before the Court are defendant Juan Jose Martinez Vega's Motion For A New

Trial [Docket No. 271] and Post-Trial Motion For Judgement Of Acquittal [Docket No. 272].

For the reasons that follow, the Court will deny the motions. The defendant contends that he

entitled to a new trial pursuant to Rule 33(a) of the Federal Rules of Criminal Procedure

"based on the combined effects of (1) the failure of the United States to correct the false

testimony provided by one of its agents, DEA Intelligence Research Specialist ("IRS")

Francisco Garrido, and (2) the United States having mislead the jury as to what was known

about other persons using the name Chiguiro." (Def.'s Mot. for New Trial 1.) The defendant

also insists that he is entitled to a judgment of acquittal based on the government's asserted

failure to prove – by either direct or circumstantial evidence – that the defendant knew that

any cocaine involved in the conspiracy was intended to be imported into the United States.

(Def.'s Mot. for J. of Acquittal ¶ 2.) For the reasons that follow, the Court will deny the

motions.

# I. BACKGROUND

On March 1, 2006, Juan Jose Martinez Vega, who is also known as "Chiguiro," was indicted with 50 other individuals pursuant to a superseding indictment that charged them with unlawfully, intentionally, and knowingly combining, conspiring, confederating and agreeing with others known and unknown to violate the narcotics laws of the United States. (Indictment ¶ 1.) The objects of the alleged narcotics conspiracy were (1) to import into the United States five kilograms and more of mixtures and substances containing detectable amounts of cocaine and (2) to manufacture and distribute five kilograms and more of mixtures, compounds and substances containing detectable amounts of cocaine, and coca leaves, intending and knowing that these controlled substances would be unlawfully imported into the United States. (Indictment ¶ 2.)

On April 21, 2008, the defendant was extradited from Colombia to the United States to stand trial for the charged crimes. After the subsequent extradition and arraignment of two other co-defendants, as well as protracted pretrial proceedings in this complex international criminal case, the trial of the defendant and co-defendant Erminso Cuevas Cabrera began on February 24, 2010.

The evidence at trial[1] established that Colombia became a leader in cocaine production in the 1990s, with production from the late 1990s into the early 2000s increasing from about 25% to 60% of the world's coca. (Trial Tr. PM Session 21-22, Feb. 24, 2010.) Colombia

---

[1] The Court cautions that this summary of the trial evidence is by no means exhaustive and, instead, is primarily an abstract of the witness testimony. In addition, both Erminso Cuevas Cabrera and Juan Jose Martinez Vega filed post-trial motions seeking judgments of acquittal or a new trial so, to the extent that trial evidence related to both defendants, that evidence is summarized identically in this opinion and the opinion addressing Martinez Vega's motions.

produces between 500 and 600 metric tons of cocaine annually and is the "number-one coca cultivator as well as the number-one producer of cocaine." (Trial Tr. PM Session 24, 30, 40, Feb. 24, 2010.) The United States is the world's largest cocaine consumer and approximately 90% of the cocaine consumed in the United States comes from Colombia. (Trial Tr. PM Session 31, 42, Feb. 24, 2010.) The United States also is the predominant destination for cocaine leaving Venezuela, which borders Colombia and through which cocaine is smuggled from Colombia. (Trial Tr. PM Session 45-46, 62, Feb. 24, 2010.)

Cocaine imported from Colombia arrives in the United States as a powder that is formed into a kilogram-sized brick that is worth, on average, about $2,000 per kilogram when ready for export in Colombia and about $30,000 in the United States. (Trial Tr. PM Session 24, 31, Feb. 24, 2010.) Colombian cocaine typically has been imported into the United States via a secondary country because of transportation limitations and because narcotics traffickers tend to seek areas of "weak law enforcement," with "porous borders" that create a "path of least resistance" when compared to direct shipment to the United States. (Trial Tr. PM Session 24, 27, Feb. 24, 2010.) About 90% of the cocaine imported from Colombia into the United States travels through Central America and Mexico, with the remaining 10% traveling through Caribbean countries. (Trial Tr. PM Session 25, 27, 29, Feb. 24, 2010.) Because it is more profitable to sell cocaine in the United States versus Mexico, and the demand is greater, the vast majority of cocaine transported to Mexico from Colombia ultimately is imported into the United States. (Trial Tr. Feb. 24, 2010 PM Session 36.) Virtually every mode of transportation is used to transport cocaine from Colombia to the United States. (Trial Tr. PM Session 32-35, 50-53, Feb. 24, 2010.)

--3--

The trial evidence also established that the Fuerzas Armadas Revolucionarias de Colombia ("FARC") – a Marxist organization present almost everywhere in Colombia but particularly in rural regions of the country – initially interjected itself into the cocaine trade by extorting money from the farmers who grew coca and produced cocaine paste, as well as the drug traffickers and operators of cocaine processing laboratories, each of whom had to pay a tax to the FARC for the coca fields or for each kilogram of cocaine produced. (Trial Tr. PM Session, 37-38, Feb. 24, 2010; Trial Tr. AM Session 21-22, Feb. 25, 2010; Trial Tr. PM Session 45, Mar. 2, 2010; Trial Tr. AM Session 62, Mar. 4, 2010.) In the 1990s, the FARC began to purchase cocaine base itself and later set the price it was willing to pay. (Trial Tr. AM Session 32, Mar. 2, 2010; Trial Tr. PM Session 63, Mar. 4, 2010.) As the FARC began to appreciate the revenues generated by the cocaine trade and learned how to process cocaine it expanded its involvement to become a cocaine supplier, an operator of cocaine laboratories, and to otherwise engage in typical cocaine trafficking activities that previously were the domain of major cartels like the Medellin and Cali cartels. (Trial Tr. PM Session 38, Feb. 24, 2010; Trial Tr. AM Session 30-31, Mar. 2, 2010; Trial Tr. AM Session 64-65, Mar. 4, 2010.)

The trial evidence also established that the FARC is a hierarchical organization governed by a Secretariat and the Estado Mayor. (Trial Tr. AM Session 24-25, Feb. 25, 2010; Trial Tr. PM Session 42-44, Feb. 25, 2010.) The FARC is divided into seven Blocks, which are designated geographically with the Eastern and Southern Blocks being the most significant in terms of the production of illegal coca crops.[2] (Trial Tr. AM Session 27, 33,

---

[2]    The other Blocks consist of the Caribbean, Magdalena, and José Maria Cordova Blocks, plus the Eastern Joint Command and the Central Joint Command. (Trial Tr. AM Session

Feb. 25, 2010.) Most Colombian cocaine is produced in the eastern or southern regions of the country. (Trial Tr. PM Session 34, 37, Feb. 24, 2010.) The Blocks are further divided into Fronts, which are the military units in each Colombian department. (Trial Tr. AM Session 24-25, 27, Feb. 25, 2010.) The FARC also consists of Mobile Columns that engage in military actions against the Colombian government and Urban Fronts that operate in cities. (Trial Tr. AM Session 25-26, Feb. 25, 2010.)

Within a Front there are Finance Officer's who are responsible for managing drug trafficking and the Front's money by collecting the cocaine taxes, resources, and coca base to deliver to FARC superiors. (Trial Tr. AM Session 25, 28, Mar. 2, 2010; Trial Tr. AM Session, 60, Mar. 4, 2010.) The Finance Officer would buy or collect cocaine base from the farms where coca was cultivated and cocaine paste manufactured, weigh the cocaine base, and then pay the farmer if the farm was independently owned or simply collect it from the farms operated by the FARC. (Trial Tr. AM Session 28-29, Mar. 2, 2010.) The FARC would set the price for cocaine base and then buy it at that price from farmers. (Trial Tr. AM Session 32, Mar. 2, 2010.)

The FARC reached a pinnacle with respect to its expansion and the size of its membership during the relevant period of the conspiracy charged in the indictment, namely 1998 to 2004, which also coincided with the designation of a demilitarized zone ("DMZ") for peace talks from 1998 to 2002. (Trial Tr. AM Session 31-32, Feb. 25, 2010; Trial Tr. AM Session 28, Mar. 1, 2010.) All the FARC Fronts were active in the DMZ. (Trial Tr. AM Session 28, Mar. 1, 2010.) During that time the FARC's membership peaked at about 16,000

---

27, 30-31, Feb. 25, 2010.)

people. (Trial Tr. AM Session 21, Feb. 25, 2010.) The FARC's warfare ammunition, training, and food for personnel was funded by narcotics trafficking. (Trial Tr. AM Session 38, Mar. 1, 2010.)

The evidence revealed that it was "something normal" to hear members of the FARC commenting "that the coke was coming to the United States because it said that it is the country that most consumes it." (Trial Tr. PM Session 21, Mar. 10, 2010.) Eastern Bloc leader Mono JoJoy said during a meeting at a FARC training school "that the cocaine was all coming to the United States." (Trial Tr. PM Session 23, Mar. 10, 2010.) Mono JoyJoy also said "[t]hat the drug was going to the United States to make them go crazy, because that is the policy, that is the image that is portrayed in the FARC." (Trial Tr. PM Session 24, Mar. 10, 2010.)

Colonel Javier Mauricio Alvarez Ochoa from the Colombian National Police testified as an expert about the production of cocaine base and cocaine hydrochloride and the history and organization of the FARC. (Trial Tr. AM Session 20, Feb. 25, 2010.) Colonel Alvarez explained the equipment needed to construct a cocaine base laboratory and the process to manufacture cocaine base as well as the process to manufacture cocaine hydrochloride and the higher costs involved in equipping a cocaine hydrochloride laboratory as compared to cocaine base laboratories. (Trial Tr. AM Session 42-57, Feb. 25, 2010.) He also testified that he conducted anti-narcotic operations in the FARC's 16th and 14th Fronts and, during those operations, discovered coca crops, cocaine laboratories, illegal airstrips and cocaine complexes. (Trial Tr. AM Session 59-62, Feb. 25, 2010; Trial Tr. PM Session 9, Feb. 25, 2010.) According to Colonel Alvarez, "[t]his is a very large area where we have the illegal

crops and base cocaine labs and cocaine hydrochloride labs." (Trial Tr. AM Session 61-62, Feb. 25, 2010.)

Colonel Alvarez discussed several operations during which he raided FARC cocaine laboratories. He testified that, in 2001, he conducted an operation in the 16th Front "to combat the production of illegal crops in the area of Vichada" and found a cocaine laboratory that had "all of the standard products used in the production of cocaine hydrochloride." (Trial Tr. AM Session 69-72, Feb. 25, 2010.) Colonel Alvarez also discussed a videotape of an operation he commanded in 2002 in the former demilitarized zone. (Trial Tr. PM Session 9-11, Feb. 25, 2010.) While the jury viewed the videotape, Colonel Alvarez recounted the operation, which entailed the raid of what Colonel Alvarez described as "the largest lab I have seen in my life after Tranquilandia . . . ." (Trial Tr. PM Session 10, 14, Feb. 25, 2010.) Seven tons of cocaine base and seven tons of cocaine hydrochloride were discovered at that laboratory. (Trial Tr. PM Session 15, 17, Feb. 25, 2010.)

Witness Viviana Ortiz testified that she joined the FARC when she was 14 years old and was a former member of the FARC's 16th Front under the leadership of Negro Acacio.[3] (Trial Tr. PM Session 61-62, Mar. 1, 2010.) Rafael Ceppillo was a mobile column commander for the 16th Front at that time and Guillermo Cochornea was the Finance Officer who "was the one who collected coca base for the front."[4] (Trial Tr. PM Session 75, Mar. 1,

---

[3]     The spelling of "Negro Acacio" varies throughout the transcripts of the trial. For consistency the Court will use the spelling first documented in the transcripts, which is "Acacio" rather than "Acascio" or "Acasio;" however, quotations from the transcripts will not be altered.

[4]     Ortiz stated that nearly every day Guillermo Cochornea would go to farms along the rivers, some which belonged to the FARC and others were independent, meet with the owners or people in charge, get cocaine base, weigh the cocaine base and then make payment or simply collect it. (Trial Tr. AM Session 28-29, Mar. 2, 2010.) The cocaine base was

2010; Trial Tr. AM Session, Mar. 2, 2010.) Ortiz said she worked directly under Ceppillo and was Guillermo Cochornea's radio operator.[5] (Trial Tr. PM Session 75, Mar. 1, 2010.) Ortiz testified that she demobilized from the FARC in 2008 and entered Colombia's reintegration program, which offers assistance so former guerillas can be educated and integrated into Colombian society. (Trial Tr. PM Session 68, Mar. 1, 2010; Trial Tr. AM Session 63, Mar. 2, 2010.)

Ortiz identified the defendant and said he was "one of the people that would bring weapons into the front and take away cocaine base." (Trial Tr. PM Session 64, Mar. 1, 2010.) Ortiz stated that she first met the defendant in 2003 when she was on a mission with Ceppillo to provide security for the defendant. (Trial Tr. PM Session 77, Mar. 1, 2010.) Ceppillo told Ortiz "that we were going to be providing [the defendant] security because he was going to be coming through with weapons." (Trial Tr. PM Session 80-81, Mar. 1, 2010.) Ortiz explained that such security was provided "in case there was an attack by the Army to take the weapons." (Trial Tr. PM Session 81, Mar. 1, 2010.) Ortiz said that after they arrived at the location the defendant passed by with trucks and other vehicles. (Trial Tr. PM Session 81, Mar. 1, 2010.) The defendant stopped and got out to speak to Ceppillo, greeted everyone and then left. (Trial Tr. PM Session 81, Mar. 1, 2010.) Ortiz was told that the defendant was "going to the front, the area of the front to deliver the weapons." (Trial Tr. PM Session 82, Mar. 1, 2010.) Ortiz remained at that location and the defendant passed by

---

packaged in plastic and put into burlap sacks. (Trial Tr. AM Session 29-31, Mar. 2, 2010.)

[5]      Ortiz testified that, as Guillermo Cochornea's radio operator she was responsible for reporting to Negro Acacio at scheduled times and spoke over the radio using codes to avoid interception. (Trial Tr. AM Session 33, Mar. 2, 2010.)

again later in the afternoon with "cocaine base in the trucks" in many burlap bags that each could hold up to 40 kilograms. (Trial Tr. PM Session 82-83, Mar. 1, 2010.) When the prosecutor asked who was in charge of the defendant's group, Ortiz responded "[h]e was, Chiguiro." (Trial Tr. AM Session 23, Mar. 2, 2010.)

Ortiz next saw the defendant when she accompanied Ceppillo to the defendant's house in Vichada, where they had lunch. (Trial Tr. AM Session 23, Mar. 2, 2010.) Ceppillo met with the defendant while Ortiz had lunch on the patio and then Ortiz and Ceppillo left. (Trial Tr. AM Session 24, Mar. 2, 2010.)

Ortiz later saw the defendant again when she was working as Guillermo Cochornea's radio operator. (Trial Tr. AM Session 35, Mar. 2, 2010.) The defendant arrived by boat at a camp where there were stash houses, spoke to Guillermo Cochornea and "then went on his way to Negro Acacio." (Trial Tr. AM Session 35, Mar. 2, 2010.) The defendant returned in the afternoon and Guillermo Cochornea "gave him some cocaine base." (Trial Tr. AM Session 36, Mar. 2, 2010.)

Ortiz also reviewed Government's Exhibit 802, which was a videotape showing "guerillas . . . crossing a river with Chiguiro" and she identified both the defendant and Guillermo Cochornea on the videotape. (Trial Tr. AM Session 39, Mar. 2, 2010.) When the prosecutor asked whether the defendant appeared to be carrying a weapon in the video, Ortiz responded "[y]es, sir, he would always carry a pistol." (Trial Tr. AM Session 39, Mar. 2, 2010.) Ortiz further stated that no civilians in the 16th Front carried weapons because weapons "belonged to the FARC." (Trial Tr. AM Session 39, Mar. 2, 2010.)

Ortiz testified that the last time she saw the defendant she was a member of Negro Acacio's special guard located at another camp on a riverbank. (Trial Tr. AM Session 40, 41,

Mar. 2, 2010.) The defendant arrived by speedboat one day to deliver long and short rifles to Negro Acacio. (Trial Tr. AM Session 42, Mar. 2, 2010.) The defendant spoke to Negro Acacio and then the defendant was given cocaine base in several sacks. (Trial Tr. AM Session 43, Mar. 2, 2010.) The defendant then departed by speedboat on the river. (Trial Tr. AM Session 44, Mar. 2, 2010.)

Ortiz related that, on the day the defendant was arrested in Venezuela, Negro Acacio "brought us all together and told us what was going on in the front, and that [the defendant] had been arrested on the Venezuelan border with a load." (Trial Tr. AM Session 45, Mar. 2, 2010.) Ortiz further stated that "[h]e did not explain what it was. But we knew the load had to have been either coca, cocaine base, or weapons." (Trial Tr. AM Session 45, Mar. 2, 2010.)

Before Ortiz left the FARC she was seriously injured during an aerial bombing of her camp during which Negro Acacio was killed. (Trial Tr. AM Session 46-47, Mar. 2, 2010.) Guillermo Cochornea became the 16th Front's leader after Negro Acacio was killed. (Trial Tr. AM Session 49, Mar. 2, 2010.)

On redirect, Ortiz testified that, at one point in time, she saw a lot of United States currency that had gotten wet and was being dried in a field. (Trial Tr. PM Session 35, Mar. 2, 2010.) She also testified that, with the exception of Colombian pesos, she never saw any other currencies while she was in Colombia. (Trial Tr. PM Session 35, Mar. 2, 2010.) Ortiz concluded by confirming that, with the exception of the defendant, she never heard anyone else in the 16th Front referred to as "Chiguiro." (Trial Tr. PM Session 50, Mar. 2, 2010.)

Witness Mauricio Parra Diaz testified that he joined the FARC in 1990 when he was 20 years old and remained a member of the FARC's 16th Front for 17 years. (Trial Tr. PM Session 38-39, 42, Mar. 3, 2010; Trial Tr. AM Session 54, Mar. 4, 2010.) He stated that

Negro Acacio was a commander of the 16th Front, which was part of the Eastern Block. (Trial Tr. AM Session 53-54, 55-56, Mar. 4, 2010.) He also stated that the 1st Front and the 16th Front were the "most important" Fronts for the Eastern Block. (Trial Tr. AM Session 56, Mar. 4, 2010.) Parra Diaz explained that:

> These two fronts were most important because they had the most strategic corridors in the area – in that area. And when I say strategic corridor, what I'm referring to is that it bordered with Venezuela and Brazil, which is where they would move all of their drug trafficking. That is why it was the most important for the FARC, to have that close just to the borders.

(Trial Tr. AM Session 56-57, Mar. 4, 2010.)

Parra Diaz testified that Guillermo Cochornea and Rafael Ceppillo took over finances for the 16th Front after the prior Finance Officer deserted and, at that time, Negro Acacio became the leader of the 16th Front. (Trial Tr. AM Session 60, 61, 62, Mar. 4, 2010.) According to Parra Diaz, Cepillo "was in charge of the weapons for the front, and Guillermo Cochornea was in charge of the drug trafficking." (Trial Tr. AM Session 62, Mar. 4, 2010.) Parra Diaz said that, initially, the FARC did not buy drugs but simply collected a tax from the laboratories and Guillermo Cochornea received the collected tax. (Trial Tr. AM Session 63, Mar. 4, 2010.) He said that the largest amount of cocaine tax money that he saw collected at one time was based on "[a]bout three, four, five tons" of cocaine. (Trial Tr. AM Session 64, Mar. 4, 2010.)

Parra Diaz said that, around 1997, the FARC gathered intelligence and learned how cocaine was processed so they took over the management of the cocaine kitchens and laboratories. (Trial Tr. AM Session 64-65, Mar. 4, 2010.) Parra Diaz stated that Negro Acacio sent him to work surreptitiously for one of the cocaine laboratories to uncover a suspected infiltrator. (Trial Tr. AM Session 65-66, Mar. 4, 2010.) The laboratory processed cocaine base into cocaine powder and then the cocaine powder would be stashed, which

involved burying the cocaine in plastic drums. (Trial Tr. AM Session 67-68, Mar. 4, 2010.) Parra Diaz said that he had guarded stashes. (Trial Tr. AM Session 67, Mar. 4, 2010.)

Parra Diaz identified the defendant and stated that he knew him only by the name "Chiguiro." (Trial Tr. AM Session 57, Mar. 4, 2010.) Parra Diaz said the first time he saw the defendant was in 2005 in Vichada when Parra Diaz was accompanying Guillermo Cochornea from camp to a town in El Placer where "Chiguiro came out to the corner and met us . . . ." (Trial Tr. AM Session 71, Mar. 4, 2010.) The second time Parra Diaz saw the defendant was during a mission with Ceppillo and two other FARC guerillas – they met with the defendant who joined them along with two "members of his troop." (Trial Tr. AM Session 72-73, Mar. 4, 2010.) The group went to a farm that belonged to a man who owned cocaine laboratories and they were told that the mission was to kill a husband and wife who were employees of the laboratory. (Trial Tr. AM Session 73-74, Mar. 4, 2010.) Parra Diaz said the wife was a cook and the husband "was a trusted man who worked at the lab" handling the radio and guarding the stash. (Trial Tr. AM Session 72-73, Mar. 4, 2010.) The defendant told them that the husband and wife "were informants for the paramilitaries, and that they had infiltrated the lab and were going to rob the lab." (Trial Tr. AM Session 74, Mar. 4, 2010.) The wife served the group breakfast, after which the husband was brought before them and beaten by the farm's owner. (Trial Tr. AM Session 73-74, Mar. 4, 2010.) The group then tied up the wife and husband, put them in a vehicle, and drove into the jungle where a hole was dug. (Trial Tr. AM Session 74, Mar. 4, 2010.) The defendant killed the husband with a "765" pistol and Parra Diaz killed the wife with the same pistol. (Trial Tr. AM Session 75, Mar. 4, 2010.) Afterward, the defendant "took his men and moved the merchandise to a different stash area." (Trial Tr. AM Session 75, Mar. 4, 2010.) Parra Diaz said he thought there was about one ton of cocaine at the laboratory that day. (Trial Tr. AM

--12--

Session 76, Mar. 4, 2010.)  Parra Diaz said he could not recall exactly how the defendant was dressed that day but that the defendant typically wore civilian clothing and carried a pistol. (Trial Tr. AM Session 76, Mar. 4, 2010.)

The next time Parra Diaz saw the defendant was later that same year when he was traveling with Guillermo Cochornea to a farm on the outskirts of Santa Rita.  (Trial Tr. AM Session 77, Mar. 4, 2010.)  The defendant was with them and Parra Diaz saw the defendant and Guillermo Cochornea talking to "some colonels from the Venezuelan army" in Santa Rita. (Trial Tr. AM Session 77, Mar. 4, 2010.)  Parra Diaz testified that he "was really scared" by the Venezuelans "because I did not know that the guerillas and the Venezuelan army were speaking, and my thought was that we were under attack, that we were being assaulted." (Trial Tr. AM Session 78, Mar. 4, 2010.)  After Guillermo Cochornea spoke to the Venezuelans, however, the group left and spent the night at a small farm where "we all stayed . . . all of us, with Chiguiro's guards, and we just talked, visited all night."  (Trial Tr. AM Session 78, Mar. 4, 2010.)  The defendant, Guillermo Cochornea and a third party left for Venezuela early the next morning.  (Trial Tr. AM Session 78, Mar. 4, 2010.)

Parra Diaz was shown portions of Government's Exhibit 802, which was the same videotape that was shown during witness Viviana Ortiz's testimony.  (Trial Tr. AM Session 39, Mar. 2, 2010; Trial Tr. AM Session 78, Mar. 4, 2010.)  As stated previously, the videotape showed the defendant and other individuals transporting a vehicle across a river from Colombia to Venezuela, including Guillermo Cochornea.  (Trial Tr. AM Session 39, Mar. 2, 2010.)  Parra Diaz identified Guillermo Cochornea on the videotape.  (Trial Tr. AM Session 83, Mar. 4, 2010.)  When asked whether civilians were allowed to carry pistols in that region of Colombia, Parra Diaz indicated that only guerillas and drug traffickers we permitted

--13--

to bear weapons, although civilians could carry shotguns. (Trial Tr. AM Session 84, Mar. 4, 2010.)

Parra Diaz said that he saw the defendant again in 2002 when Negro Acacio gave Parra Diaz an order to get ready for "an important mission." (Trial Tr. AM Session 84-85, Mar. 4, 2010.) The order was in writing and commanded Parra Diaz and three drivers to go to La Placina "to receive cargo from Chiguiro." (Trial Tr. AM Session 85, Mar. 4, 2010.) According to Parra Diaz, "the letter continued and said, in case of there is helicopters, or in case the enemy is about, you are order to sink it [sic]. The cargo cannot be seized, because if it is seized, you will be court-martialed." (Trial Tr. AM Session 85, Mar. 4, 2010.) Parra Diaz said he followed the order and the defendant was waiting "with his people" at La Placina, along with Ceppillo. (Trial Tr. AM Session 85, Mar. 4, 2010.) Parra Diaz told Ceppillo he was reporting for a mission but Ceppillo told him "no, no, no. The thing is with Chiguiro. I have nothing to do with that." (Trial Tr. AM Session 85, Mar. 4, 2010.) Parra Diaz said he reported to the defendant who told Parra Diaz to get the cargo, which was in cars. (Trial Tr. AM Session 86, Mar. 4, 2010.) Parra Diaz said the cargo was loaded into canoes and consisted of "Venezuelan military uniforms, rifles, explosives and ammunitions." (Trial Tr. AM Session 86, Mar. 4, 2010.) Para Diaz testified that the cargo filled three large canoes and one small one and "must have been eight tons." (Trial Tr. AM Session 86, Mar. 4, 2010.) Cepillo and the defendant then accompanied Parra Diaz and the cargo for the return to camp. (Trial Tr. AM Session 86, Mar. 4, 2010.) The next morning Parra Diaz saw the defendant "handing over to Negro Acacio the cargo that he had brought along." (Trial Tr. AM Session 87, Mar. 4, 2010.) Later in the day, Parra Diaz saw the defendant and Negro Acacio sitting at a table where they "were doing some kind of business" and "settling accounts," as demonstrated by the cocaine and money that was there. (Trial Tr. AM Session

--14--

87, Mar. 4, 2010.) Parra Diaz said there were "100 kilos if not more" of cocaine there that day on top of the table, near where the defendant was sitting, and below where he was sitting. (Trial Tr. AM Session 87-88, Mar. 4, 2010.)

Parra Diaz further testified that he was at the camp with Negro Acacio the day the defendant was captured in Venezuela and Acacio said "[h]e was concerned about the cargo, the load. So he told us to pay attention to what was being said about Chiguiro to know whether he had been arrested with the cargo or without." (Trial Tr. AM Session 88-89, Mar. 4, 2010.) Parra Diaz said Negro Acacio talked about "the coke that Chiguiro had, whether it had been stashed or not." (Trial Tr. AM Session 89, Mar. 4, 2010.)

Parra Diaz stated that a narcotics trafficker named Fernandino, who the 16th Front dealt with, told him that the Front's cocaine was going to the United States. (Trial Tr. AM Session 93, 94, Mar. 4, 2010.)

Intelligence Research Specialist ("IRS") Francisco Garrido testified that he took custody of the defendant on April 18, 2008, in Colombia for the purpose of extraditing him to the United States. (Trial Tr. AM Session 26, Mar. 8, 2010.) During the flight to the United States, the defendant told IRS Garrido that his nickname was Chiguiro and he described his background and early activities as a boat operator. (Trial Tr. AM Session 31-34, Mar. 8, 2010.) The defendant told IRS Garrido that, during the 1990s, "he became a transporter for the FARC's 16th Front." (Trial Tr. AM Session 34, Mar. 8, 2010.) The defendant also said that "from 1999 to 2001 he moved 1.5 tons of cocaine every 4 to 6 months for the FARC, and in addition to that he also supplied them with logistical support, you know, uniforms, things like that, and weapons." (Trial Tr. AM Session 35, Mar. 8, 2010.) IRS Garrido testified that, based on these amounts, he estimated the defendant transported 11,000 kilograms of cocaine for the FARC. (Trial Tr. AM Session 35, Mar. 8, 2010.) The defendant also

--15--

admitted to IRS Garrido that "on two or three occasions only he moved rifles" for the FARC. (Trial Tr. AM Session 35, Mar. 8, 2010.) The defendant told IRS Garrido that around 2002 he left the Vichada region in fear because the Colombian military "began making a presence" in that area and "[h]e had to stop supplying the FARC supplies and moving cocaine loads, and he left to Venezuela." (Trial Tr. AM Session 36, Mar. 8, 2010.)

Witness Carlos Gonzalez Jaramillo testified that he was a Colonel in the Colombian Army at the Military Intelligence Central of Colombia. (Trial Tr. AM Session 51, Mar. 8, 2010.) He identified the defendant and said he met the defendant during an interview at a detention center in Venezuela where Colonel Gonzalez was sent "at the request of the Venezuelan authorities who wanted cooperation in the real identification of a.k.a. Chiguiro." (Trial Tr. AM Session 51, 52, Mar. 8, 2010.) Colonel Gonzales testified that he went to the detention center and met with the defendant along with Venezuelan authorities. (Trial Tr. AM Session 52, Mar. 8, 2010.) Part of the interview was videotaped but the rest was not. (Trial Tr. AM Session 56, 57, Mar. 8, 2010.) The videotape and a translation were admitted into evidence as Government's Exhibits 3 and 3T, respectively. (Trial Tr. AM Session 58, Mar. 8, 2010.)

During the interview the defendant told Colonel Gonzales that he was connected to the FARC and "he belonged to the logistics area, and that he also had dealings with the drug trade, and that he was also in charge of selling the FARC's drugs, and fulfilled leadership roles as a FARC leader as in committing crimes in the eastern border of Colombia with Venezuela." (Trial Tr. AM Session 54, Mar. 8, 2010; Trial Tr. PM Session 56-57, Mar. 8, 2010.) The defendant said he "fulfilled orders given to him by the leaders of the FARC" and "he was in charge of selling the FARC drugs to buyers, to look for buyers, and in exchange for that he would receive in payment logistics issues such as weapons, ammunition." (Trial

--16--

Tr. AM Session 54-55, Mar. 8, 2010.) Colonel Gonzalez said he spoke to the defendant about cocaine and the defendant also talked about receiving orders from Ceppillo and Negro Acacio. (Trial Tr. AM Session 55, Mar. 8, 2010.) The defendant also admitted that he was known as Chiguiro within the FARC. (Trial Tr. AM Session 55, 61, Mar. 8, 2010.) None of these statements were recorded by videotape "because [the defendant] asked for it not to be recorded, that he would not speak if there was any recording going on." (Trial Tr. AM Session 56, Mar. 8, 2010.)

With respect to his capture in Venezuela, the defendant told Colonel Gonzalez that "he had something to do with the drugs that had been seized by the Venezuelan authorities" and that "those drugs belong to FARC and he was awaiting instructions from FARC to sell them." (Trial Tr. AM Session 62, Mar. 8, 2010; Trial Tr. PM Session 47, 49, 57, Mar. 8, 2010.) Colonel Gonzalez testified that he talked to the defendant about "him being the one that was in charge of selling FARC drugs in Venezuela" but they otherwise did not discuss drug quantities other than the drugs seized in Venezuela, which was 600 kilograms. (Trial Tr. AM Session 62, 64, Mar. 8, 2010.) Colonel Gonzalez said "the control of the drugs and a final decision that had to be made whether a deal was good or not was in the hands of the FARC leaders. And the representative of those leaders was Mr. Chiguiro." (Trial Tr. PM Session 48, Mar. 8, 2010.)

Colonel Gonzalez testified that he saw the defendant again when he was ordered to "go to Venezuelan territory [sic] so that I could bring back to Colombia the gentleman known as alias Chiguiro." (Trial Tr. AM Session 68, Mar. 8, 2010.) Colonel Gonzalez escorted the defendant on a flight from Venezuela back to Colombia. (Trial Tr. AM Session 68, Mar. 8, 2010.)

Upon his arrival in Colombia, the defendant was interviewed by Major Guillermo Rios, who was the chief of analysis to the 16th Front for the Intelligence Directorate of the Military. (Trial Tr. AM Session 18, 20-21, Mar. 9, 2010.) Major Rios said the defendant initially was nervous about the interview but, after being confronted with photographs and other information, "he started volunteering information and telling us a more complete account of his activity with the FARC." (Trial Tr. AM Session 22, 60-61, Mar. 9, 2010.) Major Rios stated:

> He recounted everything. The first contacts he had with FARC, what his role, his job had been, and that with time he had gone up in the ranks in his work, and that he ended up being in charge of the weapons, the ammunitions, the explosives of the trafficking with Venezuela and other nationalities, and in exchange for this he would receive either coke – either coca or money.

(Trial Tr. AM Session 23, Mar. 9, 2010.) The defendant also told Major Rios that "[o]f what he remembered, his rough calculations, was that he had done approximately 250 tons in combined ammunitions, weapons and explosives" in exchange for cocaine. (Trial Tr. AM Session 23, Mar. 9, 2010.) During one specific deal in 2003, the defendant "brought in 18 tons of munitions, explosives and arms." (Trial Tr. AM Session 23, 64-65, Mar. 9, 2010.) The defendant told Major Rios that "[h]e brought in materials every 20 days . . . ." (Trial Tr. AM Session 65, Mar. 9, 2010.)

The defendant told Major Rios that Negro Acacio commanded the 16th Front and gave direct orders to Guillermo Cochornea, Ceppillo and Christian, who then gave orders to the defendant. (Trial Tr. AM Session 24, Mar. 9, 2010.) The defendant said that he would meet with Guillermo Cochornea or Ceppillo at locations on the border of Venezuela or along the Orinoco, Tuparro and Vichada rivers. (Trial Tr. AM Session 24, Mar. 9, 2010.) Major Rios recalled that "bringing in the military material" involved Guillermo Cochornea, Ceppillo or Christian and they would give the defendant "the cocaine or the money" and the defendant

--18--

would give them "the ammunition or the explosives." (Trial Tr. AM Session 66, Mar. 9, 2010.) The defendant told Major Rios that "when there was a lack of money in the 16th [F]ront, then [the defendant] received cocaine in exchange for the weapons." (Trial Tr. AM Session 66, Mar. 9, 2010.) Major Rios said that the defendant "knew that in that area of the jungle there was not a whole lot of money. Things were often traded with coke. He told me – that's what he told me." (Trial Tr. AM Session 67, Mar. 9, 2010.) Major Rios also testified that the defendant "received cocaine from individuals that I mentioned earlier, the members of the 16th Front." (Trial Tr. AM Session 68, Mar. 9, 2010.)

Major Rios testified that he never came across any information that someone other than the defendant was known as "Chiguiro" during the time that he was analyzing the 16th Front.[6] (Trial Tr. AM Session 26, Mar. 9, 2010.) Major Rios also confirmed that the media in Colombia never reported about the capture of anyone else who was identified as "Chiguiro" but was not the defendant. (Trial Tr. AM Session 28, Mar. 9, 2010.) Major Rios stated that his files about the defendant showed that he was known as "Chiguiro," "Cheeky," and "Gentil Alvis Patino." (Trial Tr. AM Session 53, Mar. 9, 2010.) Indeed, Major Rios said that his agency held meetings with other Colombian intelligence agencies and during "one of those meetings we discussed Mr. Martinez Vega, and we agreed then that we all had two names under which we had him. It was Gentil Alvis Patino and Jose Martinez Vega, a.k.a., Chiguiro." (Trial Tr. AM Session 58, Mar. 9, 2010.)

---

[6] The transcript reflects that the prosecutor asked Major Rios about "the time that you worked on the 16th Front," which, out of context, might appear to indicate that Major Rios was a member of the 16th Front. Accordingly, the Court has paraphrased to indicate that Major Rios was "analyzing" the 16th Front rather than "working on" the 16th Front, which is consistent with his testimony that his position at that time was "chief of analysis to the 16th Front of the FARC." (Trial Tr. AM Session 18, Mar. 9, 2010.)

Witness Luis Restrepo testified that he joined the FARC when he was thirteen years old and was part of the Bolivarian militia, which was engaged in intelligence work. (Trial Tr. PM Session 7, Mar. 9, 2010.) Restrepo said that he had heard of the defendant and saw him in town before getting to know him and interacting with him during a FARC military training course. (Trial Tr. PM Session 7-8, Mar. 9, 2010.) After completing the course, Negro Acacio sent Restrepo and seven others to El Placer to work with the defendant, who sent them to other places. (Trial Tr. PM Session 8, Mar. 9, 2010; Trial Tr. AM Session 10-11, Mar. 10, 2010.) Negro Acacio told Restrepo and the others that their "responsibility was to investigate any enemy coming into the area, the going in and out of the area, to make sure the enemy didn't come in, whether the Army or other people coming into our area" and then the defendant assigned them to different areas. (Trial Tr. PM Session 8-9, Mar. 9, 2010.) Restrepo testified that the defendant also told them that they should monitor what was happening in town, whether the enemy would be coming, and "[w]e were to tell him because he was in charge of us. He was our – like the commander, like our immediate commander, so we had to tell him as our commander, we as the militia members." (Trial Tr. PM Session 9, Mar. 9, 2010.) Restrepo said the defendant "was our boss" but that Negro Acacio gave each person his own mission so he only spoke to the defendant as a group once during his tenure working for the defendant, although he otherwise spoke to the defendant two or three times. (Trial Tr. PM Session 54, Mar. 9, 2010; Trial Tr. AM Session 15, Mar. 10, 2010.) Restrepo said that, specifically, they were supposed to report to the defendant "[a]ny information gathered from the enemy or about people who were harvesting coca without authorization." (Trial Tr. PM Session 10, Mar. 9, 2010.) Restrepo also said "there was a general instruction that if anybody saw anybody taking cocaine without any authorization, we were to report it" to the defendant. (Trial Tr. PM Session 7, Mar. 9, 2010.) Restrepo explained that they were to

--20--

report unauthorized cocaine trade to the defendant "because he was the one that had direct communication with the commander, Negro Acascio." (Trial Tr. PM Session 10, Mar. 9, 2010.)

Restrepo said that the townspeople and farmers in El Placer called the defendant "Chiguiro" and he never heard anyone call the defendant by his true name. (Trial Tr. AM Session 14, Mar. 10, 2010.) He said the defendant was well known in the town. (Trial Tr. AM Session 14, Mar. 10, 2010.)

After working with the defendant for five or six months, Restrepo joined the FARC's rank and file. (Trial Tr. PM Session 11, Mar. 9, 2010.) Restrepo said he saw the defendant three times after that. (Trial Tr. PM Session 12, Mar. 9, 2010.) The first time Restrepo saw the defendant the defendant was talking to Negro Acacio at a camp in the 16th Front. (Trial Tr. PM Session 12, Mar. 9, 2010.) Restrepo testified that the defendant brought weapons – long rifles and different caliber weapons – and "was taking them to Negro [Acacio] for the front." (Trial Tr. PM Session 13, Mar. 9, 2010.) Restrepo said Negro Acacio gave the defendant coca[7] in return in two or three sacks that could hold about 50 to 60 kilograms. (Trial Tr. PM Session 13, Mar. 9, 2010.) On another occasion Restrepo saw "the same thing" – the defendant brought 30 to 40 arms to Negro Acacio in exchange for coca.[8] (Trial Tr. PM Session 13-14, 17, Mar. 9, 2010.) Restrepo said that he saw cocaine in the 16th Front on several occasions "when they were preparing the cocaine, preparing bricks of cocaine" and

---

[7] Restrepo clarified on cross examination that when he referred to "coca" he meant "[c]rystal cocaine." (Trial Tr. AM Session 16, Mar. 10, 2010.) He explained that he knew the difference and that "crystal cocaine is in little bars, in little shapes and very good order. The base cocaine is very voluminous, and it is not in any particular order." (Trial Tr. AM Session 16-17, Mar. 10, 2010.)

[8] See n.5, supra.

--21--

"when they were making the cocaine." (Trial Tr. PM Session 14, Mar. 9, 2010.) Restrepo stated that "[t]hey would process it in the laboratories and prepare it to transport it to other countries." (Trial Tr. PM Session 14, Mar. 9, 2010.) He said "[t]hey would process there a thousand kilos" approximately "[e]very week, every two weeks." (Trial Tr. PM Session 7, Mar. 9, 2010.) Restrepo said that the cocaine would be stored at the laboratory "or they would have other warehouses, stashing places where they were safer." (Trial Tr. PM Session 15, Mar. 9, 2010.) Restrepo described what such a warehouse looked like and said that he worked at one where there was "[c]oca, munitions, weapons, materials for uniforms." (Trial Tr. PM Session 15, Mar. 9, 2010.) He said the warehouse he worked at had 200 to 300 weapons because a large shipment had arrived from East Asia. (Trial Tr. PM Session 15-16, Mar. 9, 2010.) He also said the warehouse stored between one to three tons of cocaine and the defendant was one of the people to whom the cocaine was to be delivered. (Trial Tr. PM Session 16-17, Mar. 9, 2010.)

The last time Restrepo saw the defendant was in 2001 when a group of guerillas including Restrepo were traveling through Santa Rita to the Chiparro River and they ran into the defendant, who said he was going to meet with Negro Acacio. (Trial Tr. PM Session 18, Mar. 9, 2010.) Restrepo said "we just greeted each other and we exchanged a few words just to say hi. Then he was going in his car, and we went away in our car." (Trial Tr. PM Session 18, Mar. 9, 2010.)

Restrepo said that, based on his observations as a member of the FARC, the defendant's role was "finances" and that "[h]e would finance the FARC with weapons, [and] automobiles" and they would be paid for "with drugs." (Trial Tr. PM Session 27-28, Mar. 9, 2010.)

Restrepo testified that, after 2002 or 2003, there was a point in time when he worked for Guillermo Cochornea, who "financed the front with money, food, weapons, uniforms, everything," which "[h]e managed to get . . . with drugs, with coca in various places." (Trial Tr. PM Session 18-19, Mar. 9, 2010.) During that time the defendant also was working with Guillermo Cochornea and Restrepo heard them "talking over satellite" and he overheard Cochornea telling his radio operator that he was going to talk to the defendant. (Trial Tr. PM Session 20, Mar. 9, 2010; Trial Tr. AM Session 19, Mar. 10, 2010.)

Restrepo also commented that, when Negro Acacio "was happy, he would say it, yeah, the coke goes to the United States. That's the place where we get the most benefit from, the most money from." (Trial Tr. PM Session 28, Mar. 9, 2010.) When the prosecutor asked Restrepo whether he ever heard Guillermo Cochornea say where the cocaine was going, Restrepo responded by saying "[s]ometimes they would have meetings in which they would speak about it, and they would say that, yeah, the coca was going to the United States." (Trial Tr. PM Session 28, Mar. 9, 2010.) Restrepo further stated that the defendant was working for both Negro Acacio and Guillermo Cochornea during the time when Restrepo heard them saying that the drugs were going to the United States. (Trial Tr. PM Session 28, Mar. 9, 2010.) On redirect, Restrepo stated again that the FARC though they could get the most money for selling their cocaine in the United States. (Trial Tr. AM Session 36, Mar. 10, 2010.)

Restrepo said he transported cocaine while working for Guillermo Cochornea, such as one time when Cochornea sent Restrepo to sell a ton of cocaine[9] to members of the AUC at

---

[9] Restrepo confirmed during cross examination that the cocaine was "crystal cocaine." (Trial Tr. AM Session 17, Mar. 10, 2010.)

Barranco Colorado in Guaviare. (Trial Tr. PM Session 20-21, Mar. 9, 2010.) Mono JoJoy[10] also sent Restrepo with about six billion pesos to get two tons of cocaine[11] from Guillermo Cochornea and transport it back to Mono JoJoy. (Trial Tr. PM Session 22-23, Mar. 9, 2010.)

Restrepo also described the demilitarized zone and said it was "lawless," there was "[n]o public authority," guerillas were there, and "[t]here were representatives of the FARC at the national level." (Trial Tr. PM Session 23, Mar. 9, 2010.) He said the FARC "did courses there" and "training," and that he saw guerillas from different Fronts bringing cocaine there. (Trial Tr. PM Session 24, Mar. 9, 2010.)

Restrepo said he left the FARC "[b]ecause I noticed – I realized that for a long while, that organization no longer had the ideals it had when I joined." (Trial Tr. PM Session 25, Mar. 9, 2010.) Restrepo explained:

> [W]hat I mean is that when I joined, they had some positive thoughts about doing work for – that favored the people. And then, I mean, everything started becoming related to cocaine. It was all cocaine, cocaine here, cocaine there, and this was not the case before.

(Trial Tr. PM Session 25, Mar. 9, 2010.) Restrepo said that, after 13 years in the FARC, he deserted with five other men and joined Colombia's demobilization program. (Trial Tr. PM Session 25, Mar. 9, 2010.)

Major Angela Beatriz Bolivar testified that she was a member of the Colombian military who worked for the Technical Intelligence Main Office of the Army, which is referred to as "C-TEC." (Trial Tr. AM Session 42, Mar. 10, 2010.) She said C-TEC "listen[s] to all the communications that are being said over radio frequencies" to "monitor to see if there is an

---

[10]    The commander of the FARC's Eastern Block, although Restrepo identified him as "the commander of the FARC." (Trial Tr. PM Session 21, Mar. 9, 2010.)

[11]    Restrepo confirmed during cross examination that the cocaine was "crystal cocaine." (Trial Tr. AM Session 18, Mar. 10, 2010.)

event going on that could be causing a risk to national security." (Trial Tr. AM Session 43, Mar. 10, 2010.) Major Beatriz said she is a speech therapist and does voice identification. (Trial Tr. AM Session 44, Mar. 10, 2010.) She testified that she is the one who controls all information about the communications in the country and she reviewed C-TEC's records regarding communications that related to individuals identified as "Chiguiro." (Trial Tr. AM Session 44, Mar. 10, 2010.) She said that, based on her review, C-TEC has no records of individuals using the name "Chiguiro" after February 2005.[12] (Trial Tr. AM Session 45, Mar. 10, 2010.)

Witness Julio Cesar Gomez testified that he was a Sergeant[13] in the Intelligence Division of the Colombian National Police. (Trial Tr. PM Session 14, Mar. 17, 2010.) He said he worked for a radio listening unit and began monitoring communications in the 16th Front in "'98, '99, part of 2000 and from 2003 to 2005." (Trial Tr. PM Session 15, Mar. 17, 2010.) He said the purpose of listening to the 16th Front's communications was "to learn about the armed activities . . . and also the cocaine trafficking activities and weapons trafficking activities of this guerilla front." (Trial Tr. PM Session 15, Mar. 17, 2010.) Sergeant Gomez said that during the course of monitoring he was able to identify, among others, the voices of Negro Acacio, Guillermo Cochornea and the defendant, who he referred to as "Alias Chiguiro, Cheeky." (Trial Tr. PM Session 16, Mar. 17, 2010.) Sergeant Gomez described how he was able to identify individual voices over radio communications and said that FARC leaders used to communicate directly over radios and would identify themselves and others by announcing their names over the

---

[12]    The defendant was arrested in Venezuela in early 2005.

[13]    He actually testified that he was an "intendente," which he said was "equal to the rank of sergeant." (Trial Tr. PM Session 14, Mar. 17, 2010.) For convenience, the Court will refer to him as Sergeant Gomez.

radio. (Trial Tr. PM Session 17, Mar. 17, 2010.) From 2001 to the present, however, there was a transition away from that practice in favor of using radio operators to communicate. (Trial Tr. PM Session 17, Mar. 17, 2010.)

Sergeant Gomez said that, during the time he monitored the 16th Front, he heard Negro Acacio communicating by radio with Guillermo Cochornea and the defendant, as well as a third party. With respect to the defendant, Sergeant Gomez testified that "because he was very active in his calls, this led me to identify the – establish the illicit activities that he was participating in, the cocaine trafficking, the weapons trafficking that he was carrying out for the 16th front in his role as a main collaborator with Negro Acacio." (Trial Tr. PM Session 25, Mar. 17, 2010.) Sergeant Gomez went on to explain how he identified the name associated with the defendant's voice and said that "[i]nitially, Negro Acacio or Negro Acacio and his radio operator would call out on the air, 'Chiguiro, Cheeky, Cheeky, Cheeky,' calling him, and this person would come up on the air and begin to participate in the calls." (Trial Tr. PM Session 25-26, 34, 38-39, 41-42, 43, Mar. 17, 2010.) He said that the voice he heard being referenced as Chiguiro was the same voice he heard in a series of calls that comprised Government's Exhibit 508T. He also said that during the time he monitored radio communications connected to the FARC he never heard anyone other than the defendant referred to as "Chiguiro." (Trial Tr. PM Session 26, Mar. 17, 2010.) Sergeant Gomez said that even if there had been two people using the same nickname in the 16th Front, he still "would have known which one was this Chiguiro." (Trial Tr. PM Session 43, Mar. 17, 2010.)

Sergeant Gomez also testified that the FARC used code words for their security during calls. (Trial Tr. PM Session 45, Mar. 17, 2010.) He explained that "[s]o, for cocaine or weapons, which you would not hear in the calls, for example, in the case of cocaine, they call

--26--

that cattle." (Trial Tr. PM Session 45, Mar. 17, 2010.) Likewise, "[f]or cocaine base, that would be called heifers or calves. Weapons would be called tools. Ammunition, candy." (Trial Tr. PM Session 46, Mar. 17, 2010.) He testified that in radio interceptions that were part of the prosecution evidence, "what we do have is dulces, candy; dulce dia, candy store; 300,000 cartridges of the – cases or cartridges of the candy store; 50,000 verdura, vegetables. And that's – what they were talking about there were dollars or money, that's what they needed to buy a property." (Trial Tr. PM Session 47, Mar. 17, 2010.)

Witness Eugenio Vargas Perdomo testified that he was known as "Carlos Bolas"[14] and first met the defendant in the 1980s while picking coca leaves. (Trial Tr. AM Session 11, 19, Mar. 18, 2010; Trial Tr. AM Session 12, Mar. 22, 2010.) Vargas said that in the years that he has known the defendant they "did many things along the Colombia/Venezuela border" such as buying "uniforms, weapons, bullets for the 16th front, as well as cars." (Trial Tr. AM Session 11, Mar. 18, 2010.) He also said they were involved in cocaine trafficking. (Trial Tr. AM Session 11, Mar. 18, 2010.)

Vargas testified that he was a member of the FARC for about three years until he was injured and "could no longer really be part of the rank and file . . . ." (Trial Tr. AM Session 19-20, Mar. 18, 2010.) After leaving the FARC, Vargas "became just a run-of-the-mill citizen" and then worked in a billiards hall. (Trial Tr. AM Session 20-21, Mar. 18, 2010.)

Vargas said he saw the defendant again in the early 1990s when Vargas went to visit his father, who lived on a farm near the defendant's farm. (Trial Tr. AM Session 21, Mar. 18, 2010.) Vargas said he and the defendant talked about problems the defendant was having with

---

[14]    When asked during cross examination how he preferred to be addressed, the witness responded that he preferred to be addressed as "Vargas." (Trial Tr. AM Session 11, Mar. 22, 2010.)

the 16th Front "because he was doing some things that the guerillas did not like. They were blaming him for what he was doing, and so he was having problems with the guerillas." (Trial Tr. AM Session 22, Mar. 18, 2010.) After Vargas advised him to do so, the defendant spoke to John 40, who was the commander of the 16th Front at that time, and resolved the matter so that he was able to continue working for the FARC. (Trial Tr. AM Session 22-23, 29, Mar. 18, 2010.) Vargas said he knew this had occurred because the defendant told him about it and Vargas "had contact with the 16th – the people from the FARC." (Trial Tr. AM Session 22, Mar. 18, 2010.)

Vargas said that for "[a]bout a year or more" after that he and the defendant lived together and "saw each other every day" working together on the border of Venezuela and "buying uniforms, ammunition, weapons, pistols, [and] that sort of thing" for the 16th Front. (Trial Tr. AM Session 20-21, 25-26, 29, Mar. 18, 2010.) Vargas said he knew the defendant only by the names "Ruben" and "Chiguiro" and explained that a chiguiro is an animal in Colombia that "is really good at diving" and the defendant was called "Chiguiro" because "he was a really good swimmer." (Trial Tr. AM Session 26-27, Mar. 18, 2010.) Vargas said he also heard other people call the defendant "Gargantilla" or "Choker, because of a scar that he has on his neck, or sometime [sic] he was called Animal, because his nickname was Chiguiro, and that's an animal, and so they called him animal." (Trial Tr. AM Session 27-28, Mar. 18, 2010.) He also relayed an experience when the defendant was hospitalized with a broken leg and needed money to get out of the hospital, so Vargas "paid" to help the defendant. (Trial Tr. AM Session 20-21, Mar. 18, 2010.)

Vargas said he stopped working with the defendant around 1992 or early 1993 when John 40 told Vargas that he was needed in another town to "to take charge of some communications

with contacts they had in Bogotá . . . ." (Trial Tr. AM Session 29, Mar. 18, 2010.) John 40

told Vargas at that time that the defendant "would stay in charge – he would remain and be in

charge of what it was that I had been doing, and he would continue on with the radio and the

communications via radio, and he would come out on the radio three times a day as had always

been done." (Trial Tr. AM Session 30, Mar. 18, 2010.) Vargas clarified that the defendant

would "keep purchasing uniforms, bullets, whatever it was that came up, that if there were any

kind of problems to make a call regarding those problems, and if anybody needed to

communicate with the FARC to call." (Trial Tr. AM Session 30, Mar. 18, 2010.)

Vargas said he and the defendant "spoke on the radio frequently" during the years 1994

and 1995. He also testified that he saw the defendant at a meeting with John 40 during which

the defendant and John 40 discussed "a general inventory of how things were going, what he

was doing, what they wanted him to do, you know, if they needed anything from him. In

general, sort of how his deals were going, and what kinds of problems that he was having."

(Trial Tr. AM Session 31-32, Mar. 18, 2010.) Vargas said the discussions between John 40 and

the defendant involved weapons and narcotics, "but more especially about weapons and

ammunitions." (Trial Tr. AM Session 32, Mar. 18, 2010.)

From 1996 to 2001, however, Vargas spoke to the defendant only rarely by radio. (Trial

Tr. AM Session 37, Mar. 18, 2010.) When they did talk, they "would never talk directly about

anything on the radio, because we would know that many people are listening in." (Trial Tr.

AM Session 37, Mar. 18, 2010.) As a result, they would "always use certain codes, or

different dialects with different names." (Trial Tr. AM Session 37, Mar. 18, 2010.) Vargas

gave several examples of the code words they frequently used, such as the word "candy" when

they were talking about ammunition or "kitchen" or "restaurant" when they were referring to

a laboratory, or "vegetables" when they were talking about United States currency, to name a few.[15]  (Trial Tr. AM Session 38, Mar. 18, 2010.)

Vargas testified that, aside from Colombian pesos, the currency he saw most frequently in the 16th Front was United States dollars.  (Trial Tr. AM Session 39, Mar. 18, 2010.)  He confirmed that during drug transactions he sometimes saw United States dollars instead of Colombian pesos and that "many times" from the 1990s to 2002 he saw large quantities of United States dollars in quantities of $2 million to $3 million all in one place.  (Trial Tr. AM Session 40, Mar. 18, 2010.)

During Vargas's testimony the prosecution played several audio recordings of intercepted radio communications involving Vargas and the defendant.  Vargas said that he talked to the defendant about cocaine and quantities over high frequency radios and telephones but always used code words.  (Trial Tr. PM Session 3-4, Mar. 18, 2010.)  Vargas identified code words used during the intercepted communications and offered his interpretation of the conversations during direct examination, cross examination and redirect.  (Trial Tr. AM Session 41-54, Mar. 18, 2010; Trial Tr. PM Session 4-19, Mar. 18, 2010; Trial Tr. AM Session 47-68, Mar. 22, 2010; Trial Tr. PM Session 3-14, 50-54, Mar. 22, 2010.)  Vargas stated that when he spoke to the defendant about cocaine transactions there were times when he would be very vague to avoid identifying cocaine as the topic.  (Trial Tr. PM Session 6, Mar. 18, 2010.)  He also identified and described a FARC code book that belonged to him and explained how it identifies radio frequencies and uses lines of numbers to represent letters or words during communications.  (Trial Tr. PM Session 7-10, Mar. 18, 2010.)  Vargas said the defendant had a similar code book but he and the defendant did not use the FARC code books during their

---

[15]     The Court is citing the English translation of the Spanish code words identified by Vargas.

communications because they had established codes and frequencies that they commonly used that were more efficient. (Trial Tr. PM Session 10-13, Mar. 18, 2010.)

Vargas said that he saw the defendant again in 2001 after he was forced, along with the 16th Front, to leave the Area they were working in Barranco Minas because the Colombian army was in the area. (Trial Tr. PM Session 20, Mar. 18, 2010.) He asked the defendant whether the defendant had a place that could process coca that Vargas stashed after one of his planes went down. (Trial Tr. PM Session 21, Mar. 18, 2010.) Because the defendant had a responsibility "to report all the business that took place in that area with regard to the buying and selling of coca," he recommended a laboratory owned by a man referred to as "Mr. Gonzalo." (Trial Tr. PM Session 22, Mar. 18, 2010.) Vargas confirmed that the defendant was able to help him convert his coca to coca base. (Trial Tr. PM Session 4-19, Mar. 18, 2010.) He also said that, at the end of 2001, he was able to secure 180 kilograms of cocaine from Gonzalo's laboratory with the defendant's help and that the defendant was present when Vargas picked up the cocaine and paid for it. (Trial Tr. PM Session 23, Mar. 18, 2010.) With the defendant's assistance, Vargas also "did two more transactions for 200 kilograms each, with the same laboratory." (Trial Tr. PM Session 24, Mar. 18, 2010.) The defendant was the middleman for the transactions between Vargas and Gonzalo and was there when Vargas picked up the cocaine, which was paid for in United States dollars. (Trial Tr. PM Session 24, Mar. 18, 2010.)

In 2002, Negro Acacio asked Vargas about obtaining ammunition for AK-47s, which Vargas said he could do but that he would need money. (Trial Tr. PM Session 25, Mar. 18, 2010.) Negro Acacio said he would tell Guillermo Cochornea to authorize Gonzalo to release 100 kilograms of cocaine to the defendant for delivery to Vargas. (Trial Tr. PM Session 26-27,

Mar. 18, 2010.)  Vargas also had discussions with the defendant and told the defendant that he

needed an additional 100 kilograms of cocaine because he needed money.  (Trial Tr. PM

Session 27, Mar. 18, 2010.)  Vargas testified that he did receive the 200 kilograms of cocaine

from the defendant and sold it in Suriname.  (Trial Tr. PM Session 27-28, Mar. 18, 2010.)

Vargas bought 150,000 AK-47 bullets, packed them, and then, as discussed with the

defendant, contracted a fishing boat that transported the packages 150 miles out to sea to a

second boat that took the ammunition "to the coast of Venezuela to be delivered to [the

defendant's] people."  (Trial Tr. PM Session 28, Mar. 18, 2010.)  The delivery never took

place, however, and the defendant told Vargas "that the weather was bad and that the people

who were working for him hadn't been able to go out."  (Trial Tr. PM Session 29, Mar. 18,

2010.)

Vargas was a shown Government's Exhibit 605, which consisted of a document

identifying people who owned him money for the sale of "coke" and the amounts in United

States dollars.  (Trial Tr. PM Session 30-31, Mar. 18, 2010.)  Vargas explained that, after 1999,

"the price of cocaine base went up.  So in order to move 500 kilos out, you needed . . . 3

billion Colombian pesos.  That was just too much money to get out of Bogota.  So after that,

purchases of cocaine were done in dollars."  (Trial Tr. PM Session 31, Mar. 18, 2010.)

Vargas also was shown Government's Exhibit 702, which a receipt that "shows taxes

have to be paid to the guerillas for the purchase of cocaine base."  (Trial Tr. PM Session 33,

Mar. 18, 2010.)  He also explained that the receipt was:

> [T]he receipt that you would give as a person in charge of any given area so that
> the person that is moving his drug out of that area would have it on his person.
> Should he run into any guerillas and they would ask, what do you have there, he
> would say, well, coca or drugs.  Then he would have to show them the receipt for
> it or else, without the receipt, he would risk the drugs being confiscated.

(Trial Tr. PM Session 31-32, Mar. 18, 2010.)

Vargas testified about a transaction that involved he and Negro Acacio contracting with a man who said he could get 200 kilograms of cocaine onto a Colombian Air Force plane that was going to the United States. (Trial Tr. PM Session 34, Mar. 18, 2010.) Vargas and Negro Acacio had 50 kilograms put on the plane, which arrived in Texas but the drugs were seized. (Trial Tr. PM Session 34, Mar. 18, 2010.)

The prosecutor asked Vargas about a man named Fernandino, who Vargas said was a kingpin in Brazil on the scale of Pablo Escobar. (Trial Tr. PM Session 35, Mar. 18, 2010.) Vargas said Fernandino bought drugs from a man known as "Jay" or "Jota," who in turn sometimes got drugs from Negro Acacio. (Trial Tr. PM Session 35, Mar. 18, 2010.) Vargas said he knew Fernandino had been arrested because "he was in the plane when we were brought down." (Trial Tr. PM Session 36, Mar. 18, 2010.)

Vargas was shown a videotape and transcript of the defendant and others moving a vehicle across the Orinoco River from Colombia to Venezuela, which was Government's Exhibits 802 and 802T. (Trial Tr. PM Session 36, Mar. 18, 2010.) While the videotape played, Vargas identified Guillermo Cochornea, the defendant, and the defendant's voice, the location in Garcitas, the pistol the defendant was carrying and the sheath, the defendant's boat, the river, and said that the movement of a vehicle on boats as shown in the video was "normal." (Trial Tr. PM Session 42-49, Mar. 18, 2010.) Vargas said he had seen the defendant transport in his boat food, gasoline, chemicals used to process coca, weapons or ammunition, and finished cocaine. (Trial Tr. PM Session 50-51, Mar. 18, 2010.) Vargas said the defendant's boat could carry three to four tons of weight. (Trial Tr. PM Session 51, Mar. 18, 2010.)

Vargas said he was involved in moving "[m]ore or less 100 tons or more" of cocaine during the time he worked for the FARC. (Trial Tr. AM Session 16, Mar. 18, 2010.) He said he was also involved in shipping weapons, including buying "10,000 rifles, AK-47s," and delivering them to the FARC's 16th Front. (Trial Tr. AM Session 17, Mar. 18, 2010.)

Vargas said the last time he saw the defendant was in 2002 when they "worked together at selling and buying drugs, that is cocaine, and from him I bought some drugs, and he sent me the cocaine to Suriname, which is where I was." (Trial Tr. AM Session 11-12, Mar. 18, 2010.) Vargas explained that he was arrested that year in Suriname for cocaine trafficking. (Trial Tr. AM Session 12, Mar. 18, 2010.) Vargas pled guilty to a United States indictment that charged him with conspiracy to traffic drugs and was sentenced in 2008 to serve 117 months of imprisonment. (Trial Tr. AM Session 12, 15, 16, Mar. 18, 2010.)

The trial took nearly six weeks and ended with the jury returning a guilty verdict against both the defendant and Martinez Vega on April 13, 2010.[16] The defendant now seeks to have the Court set aside the jury verdict against him and grant a new trial or enter a judgment of acquittal.[17]

## II. MOTION FOR A NEW TRIAL

Pursuant to Rule 33(a), the Court may vacate a judgment and grant a new trial if the interest of justice so requires. Fed. R. Crim. P. 33(a). "The Rule does not define 'interests of justice' and the courts have had little success in trying to generalize its meaning." *United States v. Kuzniar*, 881 F.2d 466, 470 (7th Cir. 1989) (Flaum, J.). "Nevertheless, courts have

---

[16] The Court's summary of the trial evidence is not exhaustive and omits evidence that relates exclusively to co-defendant Erminso Cuevas Cabrera.

[17] Co-defendant Erminso Cuevas Cabrera also filed post trial motions that are addressed separately by the Court.

--34--

interpreted the rule to require a new trial 'in the interests of justice' in a variety of situations in which the substantial rights of the defendant have been jeopardized by errors or omissions during trial." *Id.*

## A.    IRS Francisco Garrido's Testimony

The defendant takes issue with the fact that IRS Garrido testified during redirect examination that the first time he met witness Viviana Ortiz at the United States Embassy in Bogotá, Colombia, he showed her a photo array that included a photograph of the defendant. (Def.'s Mot. for New Trial ¶¶ 2-4.) During a subsequent hearing outside the presence of the jury, however, IRS Garrido testified that he had no specific recollection about whether he had shown photographs of the defendant to Ortiz. (Trial Tr. PM Session 42, Mar. 24, 2010.) The defendant asserts that the testimony presented to the jury during the redirect examination was false, the government knew it was false, the government's failure to correct the testimony was prosecutorial misconduct, and the Court's failure to demand that the government correct the false testimony warrants a new trial, notwithstanding the fact that defense counsel made no attempt to recall IRS Garrido to clarify his testimony after it became clear that he could not recollect showing Ortiz a photo array. (Def.'s Mot. for New Trial ¶¶ 5, 8, 10; Mem. of P&A In Support of Mot. for New Trial ¶¶ 3-5.)

"[D]eliberate deception of a court and jurors by the presentation of known false evidence is incompatible with 'rudimentary demands of justice.'" *Giglio v. United States*, 405 U.S. 150, 153 (1972) (Burger, J.). It is well established, however, that "[b]efore finding an error of constitutional significance, *Giglio* directs that a reviewing court must determine whether 'the false testimony could in any reasonable likelihood have affected the judgment of the jury.'" *United States v. Burch*, 156 F.3d 1315, 1329 (D.C. Cir. 1998) (Wald, J.). This has been referred to as "the materiality test for prosecutorial misconduct." *Id.*

The defendant argues that IRS Garrido's alleged false testimony was material because it bolstered Ortiz's "questionable" in-court identification of the defendant. (Def.'s Mot. for New Trial ¶ 8; Mem. of P&A In Support of Mot. for New Trial ¶ 5.) The problem with the defendant's position is that Ortiz proffered her identification based on a number of occasions when she saw the defendant under circumstances that buttress the reliability of her in-court identification. For example, Ortiz testified that she was a member of the FARC and that she first saw the defendant when she was on a mission specifically to provide security for the defendant while he passed by in a group of vehicles transporting weapons. (Trial Tr. PM Session 61-62, 77, 80-81, Mar. 1, 2010.) The defendant stopped, exited his vehicle to speak to Ortiz's commander, greeted everyone, and then left. (Trial Tr. PM Session 81, Mar. 1, 2010.) Ortiz said she remained at that location and the defendant passed by again later in the afternoon with "cocaine base in the trucks" in many burlap bags. (Trial Tr. PM Session 82-83, Mar. 1, 2010.) Ortiz also saw the defendant when she accompanied her commander to the defendant's house where they had lunch. (Trial Tr. AM Session 23-24, Mar. 2, 2010.) Later, when she was Guillermo Cochornea's radio operator, she saw the defendant arrive by boat at their camp, speak to Cochornea, leave, and then return later in the day to give Cochornea some cocaine base. (Trial Tr. AM Session 35-36, Mar. 2, 2010.) Ortiz testified that the last time she saw the defendant she was a member of Negro Acacio's special guard located at another camp where she saw the defendant arrive by speedboat to deliver long and short rifles to Acacio, speak to Acacio, obtain cocaine base in several sacks, and then leave by speedboat on the river. (Trial Tr. AM Session 40, 41, 43, 44, Mar. 2, 2010.)

The trial evidence established that Ortiz saw the defendant multiple times and had the opportunity to observe him under what appear to be routine circumstances during the regular course of activities at FARC camps or on security missions. As a result, the totality of the

circumstances indicate that Ortiz's in-court identification was sufficiently reliable to preclude a very substantial likelihood of irreparable misidentification. *United States v. Rattler*, 475 F.3d 408, 411 (D.C. Cir. 2007) (Rogers, J.). In addition, Ortiz related that Negro Acacio announced the defendant's arrest on the day it happened, from which it can be inferred that the defendant was a person of some importance to the 16th Front and, therefore, likely would make an impression on a young guerilla in that Front. (Trial Tr. AM Session 45, Mar. 2, 2010.) Consequently, the Court disagrees that Ortiz's in-court identification could be characterized as "questionable" or likely tainted by a prior suggestive identification that rendered the in-court identification unreliable or mistaken. *Simmons v. United States*, 390 U.S. 377, 383 (1968) (Harlan, J.).

More to the point, though, even assuming IRS Garrido testified falsely[18] that he showed Ortiz photographs of the defendant, there is no likelihood that this testimony could have affected the jury's judgment. *See Burch*, 156 F.3d at 1329. As the Court recited above in summary form, during the trial the government presented multiple witnesses who were able to identify the defendant in court and testify in detail about the defendant's cocaine and weapons trafficking activities for the FARC's 16th Front. As a result, there was sufficient other evidence at trial to substantiate the jury's judgment regardless of how IRS Garrido testified or, for that matter, regardless of Ortiz's in-court identification.

**B.      Evidence that Other People were Known as "Chiguiro"**

The defendant also insists that he is entitled to a new trial because the government disclosed a document that contained a photograph of a man identified as "Angel Leopoldo Lopez, aka Chiguiro" but who clearly was not the defendant. (Def.'s Mot. for New Trial ¶

---

[18]      Because the Court concludes that IRS Garrido's testimony was not material it need not determine whether in actuality it was false.

13.) The document appeared to be a Powerpoint-type slide produced by an office of the Colombian Military Intelligence known as "RIME 4" that otherwise bore no markings to explain its origin. (*Id.*) During the trial, defense counsel had the document marked for identification and questioned Major Guillermo Rios about it to no avail – Major Rios disclaimed ever having seen the document and said that no such document existed in the files of the Colombian Military Intelligence. (Trial Tr. AM Session 58, Mar. 9, 2010.)

The defendant sought to obtain identifying information about the document from the government via a motion for the production of exculpatory evidence but the government was unable to obtain additional information beyond the facts that the document was retrieved from a shared electronic storage file at the DEA Bogota Country office, none of the agents currently at that office or other data identified the origin of the document but agents who worked there in 2001 "stated that the slide was given to them by members of Colombian intelligence in or around 2001, in the context of the transmission of large amounts of information on numerous FARC members at that time." (Gov't's Opp'n to Def.'s Post-Trial Mots. Ex. 4 at 2.) The government advised the defendant's counsel that, "[i]n sum, we cannot provide any additional useful information regarding this item." (*Id.* at 2-3.)

The defendant now "asserts that the United States violated his Due Process rights by disclosing the document . . . at a time and under circumstances when Defendant could not ascertain the factual basis for the document." (Def.'s Mot. for New Trial ¶ 17.) The defendant also contends that the Court's decision rejecting a stipulation he proposed that would have stated what was known about the document was error because it left the jury with the misleading impression that "nothing resembling the document could be found in the files of Colombian Military Intelligence concerning the 16th Front." (*Id.* (emphasis in original)) The defendant also points out that "although the United States in this Court professes ignorance as

--38--

to Angel Leopoldo Lopez, the United States Department of State has listed him as someone whose assets are blocked." (*Id.* ¶ 18.)

The crux of the defendant's argument with respect to the Angel Leopoldo Lopez document is that the government violated the strictures of *Brady v. Maryland*, 373 U.S. 83 (1963), which "held that the Due Process Clause imposes upon the prosecution an obligation to disclose 'evidence favorable to an accused . . . where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.'" *United States v. Andrews*, 532 F.3d 900, 905 (D.C. Cir. 2008) (Garland, J.). As the D.C. Circuit has explained:

> Evidence is "material" only if " 'there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Kyles v. Whitley*, 514 U.S. 419, 433-34 (1995) (quoting *United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985) (opinion of Blackmun, J.)). A "probability" reaches the level of "reasonable" when it is high enough to "undermine confidence in the verdict." *Id.* at 435, 115 S.Ct. 1555; *see United States v. Bowie*, 198 F.3d 905, 909 (D.C.Cir.1999). The court does not have to be convinced that it is "more likely than not that the defendant would have been acquitted had the evidence been disclosed." *Bowie*, 198 F.3d at 909 (citing *Kyles*, 514 U.S. at 434, 115 S.Ct. 1555).

*United States v. Johnson*, 592 F.3d 164, 170-71 (D.C. Cir. 2010) (Randolph, J.). In light of these principles, the Court will consider whether there is a reasonable probability that, had additional information about the Angel Leopoldo Lopez document been timely disclosed, the result of the trial would have been different.

It appears to the Court that the defendant's argument is premised on a misconception about the nature of the evidence at trial. The defendant argues that "[a] critical issue at trial was the identity of a person or persons known as 'Chiguiro,' someone who it was claimed was an important logistical connection for the 16th Front." (Def.'s Mot. for New Trial ¶ 11.) The defendant assumes that evidence that another person associated with the FARC also used the

nickname or alias "Chiguiro" would have created doubt about whether the government was prosecuting the right person. To prevail at this strategy, though, the evidence of the conspiratorial acts proven at trial needed to be tied to a name rather than a person. For example, the defendant's strategy would have gained more traction if the evidence involved intercepted radio communications in which the *only* evidence that the defendant was a participant was a reference to the name "Chiguiro" and the witnesses made statements along the lines of "I heard the person talking on the radio say his name was 'Chiguiro' and, since this person is named Chiguiro, it must have been him talking" or "although I couldn't see the speedboat when it arrived at camp, I heard Negro Acacio say 'hi Chiguiro'" or there were documents that contained the name "Chiguiro" but otherwise offered no other identifying characteristics. Confronted with such evidence, the defendant unquestionably would have had a more meritorious claim that identity was a "critical" issue and proof that another person used the name "Chiguiro" might have undermined confidence in the verdict.

In this case, though, from the witnesses' perspective it did not matter what the defendant called himself or whether anyone else was called the same name – they saw this particular person transporting weapons and cocaine under circumstances that rendered the name the defendant used superfluous to the question of guilt. There could have been numerous people named "Chiguiro" who were assisting the 16th Front but that would not have undermined the testimony by the witnesses at trial who knew the defendant under circumstances that left little room for doubt about the reliability of their identifications of him as the person they observed engaging in conspiratorial acts. These witnesses did not have fleeting glimpses of the defendant, they worked with him, ate meals with him, and even lived with him. Furthermore, the witnesses offered consistent testimony to the extent that many of the witnesses described similar contexts in which they observed the defendant: he typically

--40--

was arriving or departing by vehicle or speedboat, with weapons or cocaine, in the same geographical region of Colombia, and he met or conversed with the same three or four leaders of the 16th Front. Moreover, Eugenio Vargas Perdomo testified about the wiretap interceptions of conversations involving the defendant during which Vargas, his wife, and his property were the subject of several of the conversations and Vargas had other reliable bases for knowing the identity of the speaker apart from any reference to the defendant's name. Thus, a revelation that some other person also was referred to as "Chiguiro" would not have measurably diminished the effect of the trial evidence. Even the videotape of the defendant transporting the vehicle across the Orinoco River to Venezuela posed no real question about identity because there was no dispute that the person seen on the videotape was the defendant, regardless of what name was used to identify him.

This case quite simply did not involve the kinds of facts and evidence that make an identity defense as viable as otherwise might be the case. As a result, whatever might have been revealed about the Angel Leopoldo Lopez document, the Court finds that it was not material because there was no reasonable probability that, had the sought-after information been found and disclosed to the defendant, the result of the proceeding would have been different. It therefore follows that no new trial is warranted based on the government's alleged failure to timely disclose information about the document.

### III. MOTION FOR JUDGMENT OF ACQUITTAL

Rule 29 of the Federal Rules of Criminal Procedure authorizes a court to set aside a guilty verdict and enter a judgment of acquittal in response to a defendant's timely motion. Fed. R. Crim. P. 29(c)(1)-(2). When considering a motion for acquittal, the Court determines whether, "viewing the evidence in the light most favorable to the Government, according the Government the benefit of all legitimate inferences, and recognizing that it is the jury's

province to determine credibility and to weigh the evidence, a reasonable jury *must necessarily entertain a reasonable doubt on the evidence presented.*" *United States v. Singleton*, 702 F.2d 1159, 1163 (D.C. Cir. 1983) (Tamm, J.) (emphasis in original). "If the evidence reasonably permits a verdict of acquittal or a verdict of guilt, the decision is for the jury to make." *Curley v. United States*, 160 F.2d 229, 237 (D.C. Cir. 1947) (Prettyman, J.).

Proof that a defendant had the requisite knowledge or intent that narcotics would be imported into the United States "may take the form of circumstantial as well as direct evidence." *United States v. Chan Chun-Yin*, 958 F.2d 440, 443 (D.C. Cir. 1992) (Buckley, J.). *Accord United States v. Martinez*, 476 F.3d 961, 968 (D.C. Cir. 2007) (Kavanaugh, J.). "[A] jury can infer a defendant's knowledge of the scope of the conspiracy from the defendant's important role in that conspiracy." *United States v. Griffin*, 324 F.3d 330, 358 (5th Cir. 2003) (DeMoss, J.). In addition, "proof of a close association between the defendant and a key player in the conspiracy can be probative of the defendant's guilty knowledge." *Id.* Knowledge of importation into the United States also can be inferred from the combined evidence of a defendant's involvement "in an international drug distribution conspiracy," knowledge about a "large and valuable" cocaine shipment and involvement in supervising its transport, and evidence that a shipment was in fact going to the United States. *Martinez*, 476 F.3d at 968. On the other hand, knowledge that cocaine was being imported into the United States has been found insufficiently established when the defendant was not involved in negotiations or meetings relating to the sale of cocaine, "came into the picture only at the end" to serve a minor role as a guide for a pilot picking cocaine up in Colombia and taking it to Panama, and there was no evidence that the defendant had been told that the cocaine was destined for the United States. *United States v. Londono-Villa*, 930 F.2d 994, 1001 (2d Cir. 1991) (Kearse, J.).

In this case, the Court is persuaded that there was ample evidence from which the jury could infer that the defendant knew the cocaine he was transporting and marketing would be imported into the United States. The evidence showed that the FARC was a major international cocaine-trafficking organization that controlled cocaine production in many regions of Colombia. The defendant had an important role in the FARC's 16th Front engaging in arms and cocaine dealing in ton quantities for FARC leaders and he had close associations with some of the conspiracy's key players. The defendant confessed that he transported 1.5 tons of cocaine every four to six months for the FARC and he was in charge of selling the FARC's cocaine to buyers in exchange for weapons and ammunition. The defendant received cocaine from Guillermo Cochornea, who was the Finance Officer for the 16th Front and he was filmed with Cochornea during an operation to move a vehicle across the Orinoco River to Venezuela. The defendant also engaged in cocaine business with Negro Acacio, who was the leader of the 16th Front. The Colombian National Police intercepted communications between Negro Acacio, Guillermo Cochornea and the defendant over radios. The defendant also worked with a major cocaine trafficker to market the FARC 's cocaine and acted as the middleman for a laboratory that processed large quantities of cocaine. The defendant was trained at a FARC military course and FARC guerillas were ordered to provide security for him while he was transporting cocaine and weapons.

The FARC leaders the defendant dealt with made clear that the FARC's cocaine was destined for the United States. The evidence revealed that it was normal to hear members of the FARC commenting that the cocaine was being imported to the United States because the United States most consumes it. Eastern Bloc leader Mono JoJoy said during a meeting at a FARC training school that all the cocaine was going to the United States because that was the

FARC policy. Both Negro Acacio and Guillermo Cochornea would discuss the fact that the Front's cocaine was going to the United States during the time period when the defendant worked for them. Negro Acacio also participated in a transaction that involved 50 kilograms of cocaine being transported to the United States on a Colombian Air Force plane. The evidence further showed that 90% of the cocaine in the United States comes from Colombia and the FARC thought it could the most money for selling cocaine in the United States. The United States also is a predominant destination for cocaine leaving Venezuela. United States currency also was frequently observed in the 16th Front in quantities of $2 to $3 million.

Viewing this evidence in the light most favorable to the government, with all legitimate inferences being drawn in its favor, including inferences about the defendant's knowledge, the Court cannot say that a reasonable jury must necessarily entertain a reasonable doubt about the evidence presented at trial. Consequently, the evidence is sufficient to support the conviction.

### CONCLUSION

For the foregoing reasons, the Court will deny Juan Jose Martinez Vega's Motion For A New Trial [Docket No. 271] and Post-Trial Motion For Judgement Of Acquittal [Docket No. 272]. An appropriate order will accompany this Memorandum Opinion.

August 30, 2010

Thomas F. Hogan
United States District Judge